# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES, | Civil No. 08-1256 (JRT/FLN) |
| Plaintiff, | |
| | **FINDINGS OF FACT,** |
| v. | **CONCLUSIONS OF LAW, AND** |
| | **ORDER** |
| JAMES J. BOYD and SHARON D. MOERI, | |
| Defendants. | |

Michael R. Pahl, **U.S. DEPARTMENT OF JUSTICE**, Post Office Box 7238, Ben Franklin Station, Washington, DC 20044, for plaintiff.

James J. Boyd, 809 Hazel Court, Mendota Heights, MN 55120, defendant *pro se*.

Lee A. Bernet, **LEE A. BERNET & ASSOCIATES**, 2334 University Avenue, Suite 190, Saint Paul, MN 55114, for defendant Sharon Moeri.

James J. Boyd and Sharon D. Moeri purchased real property located at 809 Hazel Court in Mendota Heights, Minnesota (the "real property," or the "subject property"), in 1989. The federal government subsequently investigated and prosecuted Boyd for failure to file federal income tax returns. During that investigation, Boyd purported to transfer his half-interest in the real property to Moeri for $50,000 by a contract for deed. The United States commenced this civil action to foreclose federal tax liens on the real property, to set aside the allegedly fraudulent conveyance of that real property by Boyd to Moeri, and to reduce to judgment certain federal tax assessments made against Boyd. Boyd and Moeri contend that because of the transfer, Boyd no longer has any interest in

the subject property for the United States to take. The United States reached stipulated settlements and stipulations as to priority of liens with several defendants in this case, and the clerk entered default against four other defendants. Boyd and Moeri are the only remaining defendants. This case was tried before the Court on May 28, 2010. The Court received final written submissions from the parties on June 14, 2010. Based on the entire record and proceedings, the testimony at trial, and the arguments of counsel, the Court now enters the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

1.      All of the Findings of Fact set forth herein are undisputed or have been proven by a preponderance of the evidence.

2.      To the extent that the Court's Conclusions of Law include what may be considered Findings of Fact, they are incorporated herein by reference.

### A.      The Parties

3.      The United States, at the request of the Chief Counsel of the Internal Revenue Service ("IRS"), and at the direction of the Attorney General of the United States, commenced this civil action.

4.      James J. Boyd was admitted to practice law in the State of Minnesota in 1967. *In re Boyd*, 430 N.W.2d 663, 663 (Minn. 1988) (per curiam). (Pl.'s Ex. 9.)

5.      At some point prior to 1985, Boyd made a misrepresentation to another attorney regarding satisfaction of an attorney lien, and he subsequently received a

disciplinary admonishment for that misrepresentation. *In re Boyd*, 430 N.W.2d at 667. (Pl.'s Ex. 9.)

6.     In late 1984 or early 1985, Boyd prepared a false, back-dated warranty deed for a client, directed a notary public at his law office to certify a false signature on that warranty deed, and caused that forged deed to be filed with the county recorder's office. *In re Boyd*, 430 N.W.2d at 663-64. He deliberately designed this forged deed so that his client could avoid probate proceedings. *Id.* at 665. (Pl.'s Ex. 9.)

7.     In February 1985, Boyd provided a title opinion affirming the false transfer of property described in the preceding paragraph. *In re Boyd*, 430 N.W.2d at 664. (Pl.'s Ex. 9.)

8.     Boyd is not married and resides at 809 Hazel Court, in Mendota Heights, Minnesota.

9.     Sharon D. Moeri is not married and resides at 809 Hazel Court, in Mendota Heights, Minnesota.

10.     Boyd and Moeri became romantically involved with each other in approximately 1984 or 1985. They began living together in approximately 1986, and they continue to live together as of the date of trial.

11.     In 1987 and 1988, Moeri was known as Boyd's fiancée. (Moeri Ex. 15.)

12.     During their romantic relationship, Boyd sometimes supported Moeri financially. At other times, Boyd and Moeri shared expenses on an ad hoc basis.

13.     Boyd referred to Moeri as his "wife" in some social settings as recently as 2000.

14.	Boyd testified that in 2002, Boyd and Moeri shared a bedroom.

15.	Moeri testified that in 1996, she ceased sharing a bedroom with Boyd.

16.	Moeri testified that her romantic relationship with Boyd ended in 1996 because Boyd cheated on Moeri. Moeri further testified that she was angry at Boyd in 1996 because he had cheated on her.

17.	Boyd testified that Moeri's testimony as set forth in the preceding paragraph is not true.

18.	Moeri has not dated anyone other than Boyd since 1989.

19.	Boyd testified that his romantic relationship with Moeri ended in 2002 because Boyd's tax problems upset her.

20.	In federal tax returns filed on November 19, 2001, Boyd claimed Moeri as a dependent on his federal income tax returns for the 1996 and 1997 tax years. (Pl.'s Exs. 13-14.) Boyd was providing over half of Moeri's support in these years. (Pl.'s Ex. 29 at 9.)

21.	Boyd claimed Moeri as a dependent on his federal income tax returns for the 2001, 2002, 2003, and 2005 tax years. (Boyd Ex. 9-11; Pl.'s Exs. 24-27.) Boyd provided over half of Moeri's support in those years. (Pl.'s Ex. 29 at 9.)

22.	From approximately 1986 through and including the time of trial, Moeri has done most of Boyd's laundry, cooking, and cleaning.

23.	Boyd's testimony with respect to the end of the romantic relationship was not credible.

24.     Moeri's testimony with respect to the end of the romantic relationship was not credible.

**B.      The Real Property and the 2002 Contract for Deed**

25.     In 1989, Boyd and Moeri purchased real property at 809 Hazel Court, in Mendota Heights, Minnesota (the "real property," or the "subject property") as joint tenants.  (Boyd Ex. 1.)

26.     Boyd and Moeri financed the purchase of the real property with a mortgage from Liberty State Bank.  (Boyd Ex. 2.)

27.     At the time of the purchase, Boyd and Moeri were romantically involved with each other.

28.     Since 1989, Boyd and Moeri have used the real property as their primary residence.

29.     In 2000 and 2004, Boyd and Moeri refinanced the subject property to obtain funds for Boyd's struggling law practice.  (Pl.'s Exs. 1, 4; Boyd Exs. 3-4.)

30.     Moeri allowed Boyd to take most of the refinancing proceeds for his law practice, even though, according to Moeri's testimony, Moeri had ended her romantic relationship with Boyd in 1996.

31.     On October 8, 2002, Boyd and Rhino Bail Bonds executed a document purporting to be a statutory mortgage pursuant to Minn. Stat. § 507.15.  According to this document, the subject property was mortgaged to Rhino Bail Bonds to secure a promissory note concerning a $5,000 bail bond.  This mortgage document was registered

with the Office of the County Recorder of Dakota County, Minnesota, on July 29, 2004. (Pl.'s Ex. 3.) Boyd took out this mortgage as surety for a client's bail bond in order to keep the client out of jail. (Pl.'s Ex. 29 at 4-5.) Moeri did not sign the document, (Pl.'s Ex. 3), and Moeri was not aware that Boyd had entered into the agreement, (Pl.'s Ex. 36 at 2).

32.     On October 9, 2002, Boyd and Moeri executed a contract for deed purporting to convey Boyd's interest in the subject property to Moeri. (Pl.'s Ex. 2.)

33.     According to the contract for deed, Boyd agreed to convey his interest in the real property to Moeri in exchange for $50,000. The contract for deed required Moeri to pay the purchase price as follows:

> $500.00 paid at closing by personal check; and the balance payable in installments of $295.83 per month for 360 months, including interest at a rate of 6% per annum computed on unpaid balances. Interest shall begin on the date of sale. The first payment shall be due and payable on October 1, 2002 and all subsequent payments shall be due and payable on the 1st day of each succeeding month thereafter. Payments shall be credited first to interest and the remainder to principal. The entire balance of this contract shall be due and payable in full no later than November 1, 2032.
>
> The down payment and the subsequent payments due hereunder shall first be paid by purchaser to the Dakota County Assessor's Office until all of the unpaid property taxes are paid in full and thereafter to Seller.

(Pl.'s Ex. 2 at 2.)

34.     The contract for deed does not contain any provision allowing Moeri to pay the purchase price with in-kind services. (Pl.'s Ex. 2.)

35.     The contract for deed does not mention that any portion of Moeri's consideration relates to or derives from an antecedent debt that Boyd purportedly owed to Moeri. (Pl.'s Ex. 2.)

36.     The contract for deed states that "Upon Purchaser's prompt and full performance of this contract, Seller shall . . . [e]xecute, acknowledge and deliver to Purchaser a Quit Claim Deed, in recordable form, conveying marketable title to the Property to Purchaser[.]"  (Pl.'s Ex. 2 at 1-2.)

37.     On October 11, 2002, Boyd registered the contract for deed with the Office of the County Recorder of Dakota County, Minnesota.  (Pl.'s Ex. 2 at 1.)

38.     In December 2004, Boyd and Moeri took out a mortgage on the subject property for $37,000.  (Pl.'s Ex. 4.)  The proceeds from that mortgage funded Boyd's law practice.  Moeri agreed to sign the mortgage, even though she did not receive any of the proceeds.

39.     On or about July 18, 2003, notices of federal tax liens relating to assessments against Boyd for the 1996 through 2000 tax years were filed in Dakota County, Minnesota.  (Pl.'s Exs. 15-19.)

40.     Boyd has made the mortgage payments on the subject property, and he continues to make the mortgage payments on the subject property.  (Pl.'s Ex. 37 at 1.) He claims deductions for mortgage interest paid on the subject property.

41.     Boyd continues to pay the majority of the expenses relating to the subject property, including utility bills, homeowner's insurance premiums, waste collection, and telephone bills.  (Pl.'s Ex. 29 at 10-11; Pl.'s Ex. 37 at 1.)

42.     Since October 2002, Moeri has made all of the property tax payments relating to the subject property.  (Pl.'s Ex. 29 at 1; Pl.'s Ex. 37 at 1, 6.)

43.     The homeowner's insurance policy for the subject property from October 2006 to October 2007 lists Boyd and Moeri as insureds.  (Pl.'s Ex. 29.)  It states that Boyd is to pay the premium, and it states that the house contains one family.  (*Id.*)  Boyd pays the majority of the homeowner's insurance premiums.  (Pl.'s Ex. 37 at 1.)

**C.     Circumstances Surrounding the 2002 Contract for Deed**

44.     Prior to November 19, 2001, Boyd did not file federal income tax returns for the 1996 through 1999 tax years.  He chose not to file returns for those years, even though he was earning income as a lawyer during those years.

45.     On November 19, 2001, Boyd filed his federal income tax returns for the 1996 through 1999 tax years.  He claimed on those returns that he owed $39,538 for the 1996 tax year, $21,882 for the 1997 tax year, $19,234 for the 1998 tax year, and $13,714 for the 1999 tax year.  He did not make any payments at the time he filed these returns, but as of November 19, 2001, he knew that he owed those amounts.  (Pl.'s Exs. 15-18.)

46.     As of November 19, 2001, Boyd was concerned about facing a criminal prosecution for failure to file federal income tax returns.  Although he knew at the time that he did not have sufficient assets to pay his tax debts for the 1996 through 1999 tax years, he intended to wait until the completion of the criminal prosecution and then try to work out an arrangement with the IRS as part of the civil collection process.

47.     On February 19, 2002, the IRS assessed Boyd with approximately $115,897 in penalties and interest for the 1996 through 1999 tax years.  (Pl.'s Exs. 15-18.)

48.     At some point prior to May 3, 2002, Boyd received information from an agent from the Internal Revenue Service indicating that his income for the 1996 tax year was higher than he had claimed in the return he filed on November 19, 2001.  He was aware that the government had initiated a criminal investigation against him for failure to timely file his federal tax returns.  In May 2002, Boyd filed an amended return for the 1996 tax year.  The amended return added an additional $23,549 in taxes due for the 1996 tax year.  (Pl.'s Ex. 15.)

49.     At approximately the same time prior to May 3, 2002, Boyd received similar information about his income for the 1997, 1998, and 1999 tax years.  In May 2002, Boyd filed similar amended returns for the 1997, 1998, and 1999 tax years.  His amended returns added an additional $18,521 in taxes due for the 1997 tax year, an additional $17,555 in taxes due for the 1998 tax year, and an additional $22,278 in taxes due for the 1999 tax year.  (Pl.'s Exs. 16-18.)

50.     On June 17, 2002, the federal government filed a two-count information with the United States District Court for the District of Minnesota charging Boyd with failure to file federal income tax returns for the 1996 and 1997 tax years.  (Pl.'s Ex. 12; Boyd Ex. 5 at 7.)

51.     In July 2002, Boyd pleaded guilty to failure to file federal income tax returns for the 1996 and 1997 tax years.  (Pl.'s Ex. 12; Boyd Ex. 5 at F1.)

52.     On August 23, 2002, the U.S. Probation Office completed Boyd's Presentence Investigation Report.  Boyd's attorney received a copy of the report.  (Boyd Ex. 5.)

53.    The Presentence Investigation Report states that the statutory maximum sentence is twelve months in the custody of the Bureau of Prisons.  (Boyd Ex. 5 at 15.)

54.    The Presentence Investigation Report states:

As a result of the defendant's actions, the IRS lost $159,560 in unpaid taxes.  It is anticipated the IRS will attempt to recover its losses through its available resources.  These losses not only include taxes owed, but also interest and penalties.

(Presentence Investigation Report at 2, Boyd Ex. 5 at 8.)

55.    The Presentence Investigation Report further states:

The defendant has been involved in a relationship with Sharon Moeri, age 53, since 1985.  Ms. Moeri resides with the defendant.  She is a homemaker; however, she was previously employed by the defendant. Ms. Moeri was interviewed by the U.S. Probation Officer during a home visit.  She was surprised when she learned of the charges filed against Mr. Boyd.  She believes criminal conduct is outside of his character.  She remains supportive of him and intends on remaining in their relationship. She realizes he will be punished; however, she requests leniency in sentencing.

(Presentence Investigation Report at 5, Boyd Ex. 5 at 11.)

56.    The Presentence Investigation Report further states that "[u]pon release from imprisonment, the defendant intends to reside with Ms. Moeri in their home in Mendota Heights."  (Presentence Investigation Report at 5, Boyd Ex. 5 at 11.)

57.    The Presentence Investigation Report lists three bank accounts, a 1994 Ford Explorer, and the subject property as Boyd's assets.  According to the report, the value of the assets other than the subject property is $15,729, the value of the subject property is $220,000, and the value of Boyd's total assets is $235,729.    The Presentence Investigation Report lists state and federal income taxes, property taxes, credit cards, and

a home mortgage as Boyd's liabilities. Those liabilities total $357,012, including $108,000 owing on the mortgage. The liabilities do not include interest and penalties assessed on the federal income taxes. These liabilities include the mortgage on the subject property, credit card debts, and past taxes due. The report lists Boyd's total monthly income as $3,900. (Presentence Investigation Report at 7-8, Boyd Ex. 5 at 13-14.)

58.    On September 26, 2002, Magistrate Judge Arthur J. Boylan scheduled Boyd's sentencing for October 24, 2002. (Pl.'s Ex. 12.)

59.    Prior to sentencing, Boyd's defense attorneys were fairly confident that they could persuade the Magistrate Judge to impose a sentence that would allow Boyd to avoid incarceration and to continue to practice law. They filed a motion for downward departure on behalf of Boyd. (Pl.'s Ex. 12.)

60.    One of Boyd's attorneys prepared the contract for deed in September 2002. (Pl.'s Ex. 29 at 11.)

61.    On October 9, 2002, when Boyd and Moeri executed the contract for deed, Boyd retained the following assets: his law practice, a 1994 Ford Explorer, and some household furnishings and personal effects. He did not have any real property other than the subject property. He did not have sufficient funds in a bank account to pay off his tax debts. (*See* Pl.'s Ex. 29 at 2-3.)

62.    As of October 9, 2002, Boyd owed the United States approximately $276,676.19 in past due taxes, penalties, and interest. (Pl.'s Ex. 39.)

63.     At the time Boyd and Moeri executed the contract for deed, they were romantically involved with each other.

64.     Boyd testified that the purpose of the contract for deed was to protect him and his son while Boyd was in prison.  (*See also* Pl.'s Ex. 29 at 2-4.)

65.     Moeri testified that the purpose of the contract for deed had nothing whatsoever to do with protecting Boyd and his son while Boyd was in prison.

66.     Moeri testified that the purpose of the contract for deed was to address Boyd's desire to sell the subject property and Moeri's desire to keep the subject property.

67.     On October 24, 2002, Magistrate Judge Boylan sentenced Boyd to a term of three years probation, with the twelve months of home monitoring and electronic home surveillance, as well as twenty hours of community service for every ninety days of probation.  The Court imposed the following special condition: "The defendant shall cooperate fully and completely with the Internal Revenue Service (IRS) in calculation and collection of civil tax liabilities, interest, and penalties."  (Boyd Ex. 6; Pl.'s Ex. 12.)

68.     After October 9, 2002, there were no substantial changes to Moeri's or Boyd's use of the subject property based on Moeri's signing of the contract for deed.

**D.     Performance of the Terms of the 2002 Contract for Deed**

69.     In 2002, Moeri had substantial IRAs valued at approximately $90,000. (Pl.'s Ex. 37 at 4.)

70.     As of October 9, 2002, Moeri had sufficient funds to pay the full amount of consideration set forth in the 2002 contract for deed.  (Pl.'s Ex. 37 at 4.)

71.     Moeri testified that when she signed the contract for deed, she wanted to prepay the contract for deed and pay it off right away.

72.     At the closing on the 2002 contract for deed, Moeri did not pay Boyd $500. (*See* Pl.'s Ex. 37 at 3-4.)

73.     Moeri testified that on October 10, 2002, she paid Boyd $4,500 on the contract for deed.

74.     Moeri's interrogatory answers state that she made her first payment on the contract for deed in August 2003, in the sum of $4,000.  (Pl.'s Ex. 37 at 3.)

75.     Moeri has never made a single monthly payment in the amount of $295 to Boyd or to the Dakota County Assessor's Office.  (Pl.'s Ex. 37 at 11.)

76.     Boyd testified that Moeri never made any monetary payments to Boyd under the terms of the contract for deed.  (*See also* Pl.'s Ex. 29 at 2.)

77.     As of 2003, Moeri had approximately $120,000 in one IRA account.

78.     As of 2004, Moeri had approximately $170,000 in one IRA account.

79.     From 2002 to 2004, Moeri did not make any contributions to her IRA accounts.

80.     At any time from 2002 to 2004, Moeri was financially capable of paying off the contract for deed in full, satisfying all of the terms and conditions of the contract for deed.

81.     In April 2004, Boyd met with an IRS officer regarding his tax situation.  He filled out a Collection Information Statement and signed it under penalty of perjury.

(Pl.'s Ex. 6.)  The statement does not list as income any payments from Moeri on the contract for deed.  (*Id.*)

83.    In June 2005, Boyd filed a petition for bankruptcy that listed the contract for deed as Boyd's personal property valued at $3,845.79.  (Pl.'s Ex. 5 at USA152.)  It further states, "13 months at $295.83."  (*Id.*)

83.    In February 2006, Boyd filed an amended petition for bankruptcy that listed the contract for deed as Boyd's personal property valued at $47,527.30.  (Boyd's Ex. 12 at Sch. B.)

84.    Boyd testified that Moeri satisfied in full all of the terms and conditions of the contract for deed by providing Boyd with household services.  (*See also* Pl.'s Ex. 29 at 2.)

85.    Boyd did not keep any record of receipt of payments from Moeri on the contract for deed.

86.    Moeri has continued to provide household services since she purportedly satisfied in full all of the terms of the contract for deed.  At the time of trial, Moeri continued to perform all or primarily all of the household chores at the subject property, including laundry, cooking, and cleaning, for herself and for Boyd.  Moeri also performed substantially the same household services for herself and for Boyd prior to October 9, 2002.

87.    Moeri testified that she did not provide Boyd with household services as payments on the contract for deed.

88.     Moeri testified that she satisfied all of the terms of the contract for deed by providing Boyd with occasional lump sum monetary payments when Boyd requested them.  Moeri did not provide the Court with any written record of these payments.  Moeri never obtained any receipts from Boyd for these payments.

89.     Moeri testified that as of February 2006, she owed approximately $6,000 remaining on the $50,000 owing under the contract for deed.  She further testified that she subsequently made smaller payments of approximately $200 per month until the United States filed suit in this case.  She testified that she last wrote Boyd a check under the contract for deed in 2008, but that in her mind she had fully satisfied, and perhaps even overpaid, the terms and conditions of the contract for deed as of 2006.

90.     Moeri testified that she could not give a precise date when she made her final payment to Boyd in full satisfaction of the terms and conditions of the contract for deed.

91.     Moeri did not file any federal income tax returns and reported no wages or other income for the 2000, 2001, 2002, 2003, and 2005 tax years.  (Pl.'s Exs. 30-35.)

92.     Moeri was not working in 2001, 2002, or 2003.

93.     Moeri filed a federal income tax return for the 2004 tax year.  She listed her occupation as "unemployed," and she did not report any wage income.  (*See* Pl.'s Ex. 34.)

94.     After Boyd was disbarred in 2005, Moeri resumed working.

95.     Boyd testified that he no longer has a property interest in the subject property.

96.     Boyd testified that he could not determine the exact date when Moeri completed performance on the contract for deed.

97.     Boyd has never given Moeri a quit claim deed to the subject property.

98.     Moeri has not taken any legal action against Boyd to obtain a deed to the subject property.

99.     Moeri places only one restriction on Boyd's use of the subject property: Moeri must be present when Boyd has guests in the house whom Moeri does not know. (*See* Pl.'s Ex. 29 at 4; Pl.'s Ex. 37 at 7.)

100.     Boyd's testimony with respect to performance of the terms of the 2002 contract for deed was not credible.

101.     Moeri's testimony with respect to performance of the terms of the 2002 contract for deed was not credible.

## E.     Additional Findings of Fact

102.     In 2005, the Minnesota Supreme Court disbarred Boyd from the practice of law.  *In re Petition for Disciplinary Action Against Boyd*, 691 N.W.2d 472, 472 (Minn. 2005).  The allegations that formed the basis for Boyd's disbarment included allegations that he "commingl[ed] personal funds in his trust account in order to shelter his and his son's funds from the tax authorities," and that he "us[ed] an estate bank account for his own personal and business purposes in order to shelter funds from the tax authorities after the estate was closed and he had been discharged as a personal representative."  *Id.*  Boyd admitted these allegations.  (Pl.'s Ex. 11.)

103.    In June 2005, Boyd filed a petition for Chapter 7 bankruptcy.  (Pl.'s Ex. 5.)

104.    In February 2006, Boyd filed an amended petition for Chapter 7 bankruptcy.  (Boyd Ex. 12.)

105.    In an order dated June 26, 2006, United States Bankruptcy Judge Gregory F. Kishel issued an order granting Boyd a discharge under Chapter 7 of the Bankruptcy code.  (Pl.'s Ex. 5.)  The order discharged Boyd's federal tax liabilities for the tax years of 1996 through 2000, (*id.* at USA157), but the federal tax liens attach to all of Boyd's pre-petition property and rights to property.

106.    As of January 31, 2008, Boyd owed the United States $102,017.90 for taxes assessed against him for the 2001 through 2004 tax years.  (Pl.'s Exs. 20-27, 29 at 9.)

107.    Tom Kelly did not represent or advise Boyd in the preparation of the contract for deed.  His testimony as to Boyd's intent in preparing the contract for deed is therefore not helpful to the Court.

## CONCLUSIONS OF LAW

## I.    The Minnesota Uniform Fraudulent Conveyance Act

Under the Minnesota Uniform Fraudulent Conveyance Act, the Court may set aside the transfer of the subject property from Boyd to Moeri as a fraudulent transfer if Boyd made the transfer "with actual intent to hinder, delay, or defraud any creditor of the debtor."   Minn. Stat. § 513.44(a)(1).   In determining "actual intent," the Court may consider, among other factors, whether:

(1)    the transfer or obligation was to an insider;

(2)     the debtor retained possession or control of the property transferred after the transfer;

(3)     the transfer or obligation was disclosed or concealed;

(4)     before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5)     the transfer was of substantially all the debtor's assets;

(6)     the debtor absconded;

(7)     the debtor removed or concealed assets;

(8)     the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9)     the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10)    the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11)    the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

*Id.* § 513.44(b).  The Court "is not limited to only those factors or 'badges' enumerated, but is free to consider any other factors bearing upon the issue of . . . intent."  *In re Sholdan*, 217 F.3d 1006, 1010 (8th Cir. 2000).  The presence of several or more of these badges of fraud gives rise to a presumption of the requisite "actual intent."  *Cf. In re Northgate Computer Sys., Inc.*, 240 B.R. 328, 360-61 (Bankr. D. Minn. 1999).

The Court finds that the facts in this case are not relevant to the third, sixth, seventh, and eleventh badges.  Boyd and Moeri disclosed the transfer by recording the contract for deed soon after execution.  Boyd did not abscond.  Boyd did not remove or conceal assets.  Moeri was not "a lienor who transferred" Boyd's interest in the subject property "to an insider of" Boyd.  The Court addresses the remaining badges of fraud in turn.

(1) Insider.   Under Minnesota law, if the debtor is an individual, an "insider" includes, *inter alia*, "a relative of the debtor."   Minn. Stat. § 513.41(7)(i)(A).   A relative is "an individual related by consanguinity within the third degree as determined by the common law, a spouse, or an individual related to a spouse within the third degree as so determined[.]"   *Id.* § 513.41(11).

Moeri is not an "insider" as defined by statute.   Nonetheless, the Court considers that at the time of the transfer, Boyd and Moeri had a relationship substantially similar to a spousal relationship.   They had been romantically involved for approximately eight years, they had lived together for almost all of that time, and Boyd provided Moeri with financial support.   From 2001 to 2003, Boyd was providing over half of Moeri's support. Moeri did all of Boyd's cooking, cleaning, and laundry.   When Boyd and Moeri were out together in social settings, Boyd referred to Moeri as his fiancée and later as his wife.   At the time of the transfer, Boyd and Moeri shared a bedroom.   Boyd's Presentence Investigation Report, which was completed shortly before the transfer, confirms that Moeri and Boyd were in a relationship at that time and that Moeri was supportive of Boyd and intended to remain in the relationship.   The report also stated that Boyd intended to reside with Moeri after being released from prison.   Therefore, although Moeri was not technically an "insider," the Court takes into account the nature of the relationship and finds that the relationship is substantially similar to that of husband and wife.   This factor weighs in favor of finding the requisite intent.

(2)   Debtor Retains Possession or Control.   After transfer, Boyd continued to reside at the subject property, and he continues to reside there to this day.   Boyd is free to

use the subject property as he pleases. After October 9, 2002, there were no changes to Boyd's use of the subject property. Moeri imposes only one minor limitation on Boyd's use of the subject property, and it is unclear whether this limitation existed prior to transfer. Boyd has not given Moeri a deed to the subject property, and Moeri has never taken any action to obtain a deed to the property.

Boyd continued to use the subject property to finance his law practice after transfer. In December 2004, after the purported transfer, Boyd and Moeri took out a $37,000 mortgage on the subject property and used the funds from that mortgage to finance Boyd's law practice. Boyd and Moeri had taken out a similar mortgage in 2000, prior to transfer.

Boyd controls finances related to the subject property. Boyd pays homeowner's insurance for the subject property and the insurance policy names him as an insured. Boyd makes mortgage payments on the subject property and claims mortgage interest deductions based on those payments. Boyd pays the majority of the expenses relating to the subject property.

All of these facts demonstrate that Boyd retains the same degree of possession and control of the property that he had prior to the purported transfer. This factor therefore weighs in favor of finding the requisite intent.

(4) Debtor Sued or Threatened with Suit. At the time of transfer, Boyd knew that the IRS would make efforts to collect on Boyd's unpaid tax liabilities. The Presentence Investigation Report was submitted approximately six weeks prior to the transfer. It states that the IRS will attempt to recover its losses from Boyd. As of October 9, 2002,

Boyd owed the United States approximately $276,000 in past due taxes, penalties, and interest.  As of October 9, 2002, Boyd was aware that the government was likely to take legal action, if necessary, to attempt to recover approximately $276,000 from Boyd.  Even if the government did not formally "threaten" Boyd with suit, Boyd testified that he anticipated that the IRS would initiate a civil collection process after the completion of Boyd's criminal prosecution.  Therefore, Boyd faced the substantial equivalent of a threat of suit at the time of transfer.  This factor therefore weighs in favor of finding the requisite intent.

(5)  Transfer of Substantially All the Debtor's Assets.  At the time of transfer, Boyd's interest in the subject property was substantially all of his assets.  His other assets included an eight-year-old car and various personal items.  Boyd's interest in his struggling law practice was not a substantial asset.  Although Boyd's law practice provided him with modest income of approximately $3,900 per month in 2002, Boyd repeatedly used the subject property as collateral to support his law practice.  The Presentence Investigation Report lists the value of Boyd's total assets as $235,729, $220,000 of which comprises the subject property.  Boyd's interest in the subject property was therefore substantially all of Boyd's assets.  This factor therefore weighs in favor of finding the requisite intent.

(8)  Value of Consideration Received.  The value of the consideration Boyd received was not reasonably equivalent to the value of the asset transferred.  Neither Boyd nor Moeri provided credible testimony or other evidence to show what consideration, if any, Boyd received.

Moeri's household services were not consideration. Moeri provided Boyd with household services prior to October 9, 2002 free of charge, and she continues to provide those services to Boyd free of charge, even though Boyd and Moeri contend that Moeri has already fully satisfied all of her obligations under the contract for deed. Under Boyd's theory, Moeri therefore did not provide any consideration, because she did not give something of value in return for Boyd's interest in the subject property. *See Brooksbank v. Anderson*, 586 N.W.2d 789, 794 (Minn. Ct. App. 1998) ("The issue of whether consideration truly exists is not one of mere formalism; something of value must be given in return for performance or promise of performance."); *Deli v. Hasselmo*, 542 N.W.2d 649, 656 (Minn. Ct. App. 1996) ("Consideration is something of value given in return for a performance or promise of performance that is bargained for; consideration is what distinguishes a contract from a gift."). Boyd accrued no benefit and Moeri suffered no detriment in exchange for Boyd purportedly conveying his interest in the subject property to Moeri. *See C&D Investments v. Beaudoin*, 364 N.W.2d 850, 853 (Minn. Ct. App. 1985) ("Consideration may consist of either a benefit accruing to a party or a detriment suffered by another party."). Moeri simply continued to do the same cooking, cleaning, and laundry that she did prior to October 9, 2002, and that she does to this day.

Moeri failed to provide consistent, credible, corroborated testimony as to the payments she purportedly made to Boyd as consideration under the contract for deed. She testified that she wanted to purchase Boyd's interest in the subject property in full right away, and that she had sufficient funds to do so at any time from 2002 to 2004. According to her testimony, however, she instead made occasional lump sum payments.

Moeri's testimony as to the nature and amount of those payments contradicted her interrogatory responses, Boyd's testimony, information contained in Boyd's bankruptcy petitions, and Boyd's Collection Information Statement. Although some of these occasional, lump-sum payments may have been consideration under the contract for deed, their value was not reasonably equivalent to the value of Boyd's interest in the subject property.

Defendants have failed to establish what consideration, if any, Boyd received, and they have also failed to establish the value of that consideration. Therefore, the Court concludes that the value of any consideration Boyd received was not reasonably equivalent to the value of Boyd's interest in the subject property. This factor weighs in favor of finding the requisite intent.

(9) Debtor Insolvency. Boyd was insolvent at the time of transfer. Under Minnesota law, "[a] debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets[.]" Minn. Stat. § 513.42(a). Boyd's Presentence Investigation Report shows that Boyd had $357,012 in debts, not including the interest and penalties assessed on his federal income taxes. According to the report, he had $235,729 in assets, including the full value of the subject property. Because the sum of Boyd's debts was greater than all of Boyd's assets, Boyd was insolvent at the time of transfer. This factor weighs in favor of finding the requisite intent.

(10) Transfer Shortly Before or After Debtor Incurs a Substantial Debt. Boyd's tax debt was substantial, but the parties dispute whether Boyd incurred that debt near the time of transfer. As discussed with respect to the fourth factor, an IRS collection action

was imminent at the time of transfer. Boyd had incurred most of that debt, however, more than one year before the transfer. Eight months prior to the transfer, however, the IRS assessed Boyd with approximately $115,000 in penalties and interest, and interest and penalties continued to accrue through the time of transfer. In light of the fairly long period of time between this assessment and the transfer, the Court concludes that this factor weighs only slightly in favor of finding the requisite intent.

The Court is not limited to the eleven factors listed above and therefore considers the following additional factor in determining whether Boyd made the transfer "with actual intent to hinder, delay, or defraud any creditor of the debtor." Minn. Stat. § 513.44(a)(1). At the time of transfer, Boyd had attempted to shelter his and his son's funds from tax authorities by commingling personal funds in a trust account and by using an estate bank account for personal and business purposes. The Court concludes that this conduct is probative of Boyd's intent in transferring his interest in the subject property to Moeri. The Court further concludes that this conduct weighs in favor of finding the requisite intent.

Based on the foregoing factors, the Court finds that the United States is entitled to a presumption that the 2002 contract for deed was a fraudulent conveyance. The Court further finds that Boyd and Moeri have failed to meet their burden of production to show that the 2002 contract for deed was not a fraudulent conveyance. *See Argonaut Ins. Co. v. Cooper*, 395 N.W.2d 119, 121-22 (Minn. Ct. App. 1986). Boyd executed the contract for deed "with actual intent to hinder, delay, or defraud" the United States. Minn. Stat.

§ 513.44(a)(1). The Court therefore sets aside the transfer of the subject property from Boyd to Moeri as a fraudulent transfer.

## II.    Alter Ego

The Court briefly addresses the government's alternative theory of relief. In determining whether Moeri holds Boyd's interest in the subject property as Boyd's alter ego or nominee, the Court considers whether Boyd treated the subject property as his own, whether Boyd carried insurance on the subject property in his own name, whether Boyd had substantial control over Moeri's finances, whether Boyd and Moeri had a close family relationship, and whether Boyd transferred his interest to Moeri for little or no consideration. *Cf. Loving Saviour Church v. United States*, 728 F.2d 1085, 1086 (8th Cir. 1984) (per curiam). The parties agree that those factors substantially overlap with the factors discussed above regarding the Minnesota Uniform Fraudulent Conveyance Act. For the reasons set forth in Part I, the Court finds that Moeri is holding Boyd's interest in the subject property as Boyd's alter ego or nominee. Therefore, the United States is entitled to seize and sell Boyd's interest in the subject property to collect Boyd's tax liability. *See id.*

## CONCLUSION

Because the transfer of Boyd's interest in the subject property to Moeri was a fraudulent conveyance under Minnesota law, and because, in the alternative, Moeri holds

that interest as Boyd's alter ego or nominee, the Court sets aside that transfer.[1] Therefore, as of October 2002, Boyd and Moeri retain their respective half-interests in the subject property. Boyd's bankruptcy proceeding did not discharge the United States' tax lien on the subject property. The Court herein makes no determination as to the priority of the United States' tax lien on the subject property.

## ORDER

Based on the submissions and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that:

1.     The 2002 **TRANSFER** of James J. Boyd's interest in the real property located at 809 Hazel Court in Mendota Heights, Minnesota, to Sharon D. Moeri **IS SET ASIDE**;

2.     The United States' **TAX LIENS** attach to Boyd's interest in that real property **ARE ORDERED FORECLOSED**;

3.      The **REAL PROPERTY** located at 809 Hazel Court in Mendota Heights, Minnesota, **SHALL BE SOLD** in partial satisfaction of Boyd's tax liabilities;

---

[1] Boyd argues that the subject property is a tenancy by the entirety exempt from the definition of "asset" under Minn. Stat. § 513.41(2)(iii) because a "'joint tenancy' in property by its very essence and nature defines an interest as property held in tenancy by the entireties." (Boyd's Proposed Findings of Fact at 3, Docket No. 88.) Minnesota law does not recognize the estate of tenancy of the entirety, and even if it did, "[a] tenancy of the entirety . . . can exist only between husband and wife." *Hendrickson v. Minneapolis Fed. Sav. & Loan Ass'n*, 161 N.W.2d 688, 690 (Minn. 1968). Boyd concedes that "Moeri is not Boyd's spouse." (Boyd's Proposed Findings of Fact at 6, Docket No. 88.) Boyd's argument is therefore entirely without merit.

4.     The United States shall (a) submit a proposed order of sale, and (b) move for entry of a separate money judgment based on Boyd's tax liabilities for the 2001 through 2004 tax years; and

5.     Costs are awarded to the United States.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED:  August 30, 2010                                   _____s/ John R. Tunheim_____
at Minneapolis, Minnesota.                                      JOHN R. TUNHEIM
                                                           United States District Judge